ROBERT WELDON KNIGHT AND LYNN ELAINE KNIGHT, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Knight v. Commissioner
Docket No. 1015-81.
United States Tax Court
T.C. Memo 1984-376; 1984 Tax Ct. Memo LEXIS 300; 48 T.C.M. (CCH) 562; T.C.M. (RIA) 84376; July 23, 1984. *300 Held: Petitioners failed to prove that they intended to repay purported loans from certain lenders; hence, amounts of purported loans are treated as income realized in 1974 and 1975; respondent failed to prove that petitioners did not intend to repay purported loans from another lender; petitioners failed to demonstrate error in respondent's determination of capital gain income; interest deductions not allowed; additions to tax upheld. Ray A. Dunn, for the petitioners. Ana G. Cummings and Marion Friedman, for the respondent. WHITAKER
MEMORANDUM FINDINGS OF FACT AND OPINION WHITAKER, Judge: Respondent determined deficiencies in petitioners' Federal income taxes and additions to tax in the following amounts: Lynn E. Knight--
Additions to Tax
Year
Deficiency
Sec. 6651(a) [1] *301 Sec. 6653(a)
Sec. 6654(a)
1974
$128,135.76
$32,033.94
$6,406.79
$4,100.35
1975
160,689.66
40,172.42
8,034.48
5,142.08
1976
3,326.00
831.50
166.30
106.43
Robert W. Knight--
Additions to Tax
Year
Deficiency
Sec. 6651(a)
Sec. 6653(a)
Sec. 6654(a)
1974
$129,178.57
$32,294.64
$6,458,93
$4,133.72
1975
161,803.56
40,450.89
8,090.18
5,150.71
1976
3,326.00
831.50
166.30
106.43
After concessions by respondent, the issues for decision are: (1) Whether petitioners realized community income by virtue of their receipt during 1974 and 1975 of funds from various individuals and entities or whether the arrangements concerning these funds constituted loans; (2) whether petitioners realized capital gain income during 1976; (3) whether petitioners are entitled to interest deductions under section 163 for 1974 and 1976; and (4) whether petitioners are liable for additions to tax for 1974, 1975 and 1976 under sections 6651(a), 6653(a) and 6654(a). In his notice of deficiency for 1975, respondent determined, among other things, that $424,756.17 was to be included in petitioners' community income for the taxable year. This amount included that net balance due to Blacklands Production Credit Association (Blacklands) as of December 31, 1975 ($504,394.17), reduced by the value of what appears to be Blacklands Class B stock credited to petitioner Robert Weldon Knight's account in February 1976 ($52,895) and reduced further by payments totaling *302 $26,743.47 made in February 1976. After trial, respondent was granted leave of Court to amend his answer to include this amount in petitioners' community income for the taxable year 1974 instead of 1975. In his motion to file an amended answer, respondent sought an increased deficiency for 1974 to account for the tax imposed on the $424,756.17 moved from 1975 to 1974. He noted that, although entitled to do so, he would not seek an additional increased deficiency for 1974 on the ground that payments made in 1975 and 1976 did not have to be reflected in the 1974 deficiency. Respondent bears the burden of proof with respect to this increased deficiency in 1974. Rule 142(a). As to all other issues, the burden remains with petitioners. FINDINGS OF FACT Some of the facts have been stipulated and are so found. Petitioners Robert Weldon Knight and Lynn Elaine Knight (petitioners), husband and wife, resided with their three children in the State of Texas at the time their petition was filed and during all times pertinent hereto.During the years 1970 through 1976, petitioner Robert Weldon Knight (petitioner) was a practicing attorney and also was engaged in the dairy and cattle businesses, *303 as well as the meat packing, grocery and construction businesses. During 1974, 1975 and 1976, Mrs. Knight was a housewife. Petitioners did not file any returns or pay any tax for 1974, 1975 or 1976. For each of these years petitioners are entitled to five dependency exemptions. The primary issue in this proceeding involves various financial transactions purporting to be loans [2] and the shifting of funds between bank accounts engaged in by petitioner, for which he did not maintain adequate records. In the course of the period leading up to and including the years at issue, the balances owed by petitioner to others from purported loans increased dramatically. In substantial part because of petitioner's failure to maintain adequate and accurate records, the details of petitioner's financial transactions are often ambiguous, and the state of his net worth during these years is incapable of accurate determination. From the facts available in the record, however, petitioner appears to have placed himself in a situation where his borrowings probably exceeded his ability to repay. Such a conclusion is certainly consistent with his repeated misrepresentations to lenders and repeated deviations *304 from contractual obligations. To the extent that evidence concerning his transactions is available, we make the following specific findings of fact. Beginning sometime prior to 1971, petitioner began to "kite" [3] checks with his banks. This is a method of drawing against uncollected funds and causing checks to be paid through fictitious bank account balances. It involves depositing a check drawn on an account in Bank "A" into an account at Bank "B" with insufficient funds on deposit in Bank "A" to pay the check. A check drawn on an account in Bank "C" is then deposited into the account at Bank "A", although there are insufficient funds in Bank "C" to pay the check. Meanwhile, checks are being written against the account at Bank "B". AMPI
The initial transactions at issue in this proceeding involve loans that *305 petitioner obtained from AMPI Investment Corporation (AMPI). Petitioner's relationship with AMPI began in January 1971 when, in the course of operating a dairy, he obtained a loan from AMPI to finance the purchase of cattle. Under his original arrangement with AMPI, petitioner borrowed $60,000 and paid it back in monthly installments. Some of petitioner's cattle were used as security for the loan. Sometime thereafter, petitioner's borrowing procedure changed. He arranged for lines of credit with AMPI and, to obtain the funds made available by these lines of credit, he filled out and cashed AMPI drafts made payable either to himself or to his bank, depositing the proceeds into one of his bank accounts. Petitioner knew that all loans from AMPI were required by contract to be used for the specific purpose of purchasing cattle and operating his cattle business. Until 1973, most (if not all) of the funds received from AMPI were in fact used by petitioner for cattle, equipment and operating expenses and were paid back in monthly installments. All loans became due in March of the year following the making of the loan, although due dates periodically were extended by means of loan renewals. *306 Petitioner executed notes to AMPI for each loan or loan renewal and periodically executed additional notes for the amounts of drafts exceeding previous notes that were written prior to a loan renewal date. During the years 1971 through 1973, payments to AMPI by petitioner were reflected in AMPI's records in the following amounts: Year
Amounts Paid
1971
$46,900.00
1972
125,389.22
1973
393,187.98
Despite these payments, his balances owed to AMPI rose from the original advance in 1971 of $60,000 to $301,582 at the end of 1973. In part as a result of his kiting, petitioner began to run into difficulties with the banks with which he deposited his personal and business funds. Sometime in 1972, the First Denton County National Bank, after two years of warnings to petitioner about his kiting operations, refused to pay checks issued by petitioner against uncollected funds, and petitioner moved his accounts to the Western National Bank of Denton. Petitioner continued to kite checks there until, in June 1974, the bank closed his personal checking accounts. He then increased his banking transactions at the First State Bank of Denton and from July to November 1974 with that bank operated a continual *307 and large kite. At some point during 1974, petitioner was late in meeting loan payments to the First State Bank of Denton. Sometime in 1973, petitioner began to use the AMPI drafts much more extensively than he had previously, and the balance owed to AMPI substantially increased between March and late August 1974. By petitioner's own admission, a considerable amount of the funds obtained was not used to purchase cattle or to operate his cattle business but was instead used to pay off other debts. Petitioner also admits that he used some of the proceeds of the AMPI drafts to support a kite at his banks. To qualify for the lines of credit petitioner provided AMPI with several financial statements. At least two of these financial statements, dated March 19, 1974, and March 19, 1975, were by petitioner's admission incorrect in that the assets were overvalued and the liabilities understated. Therefore, although these statements purport to demonstrate that petitioner's net worth on both dates was in excess of $4 million, we cannot rely upon them as evidence of his new worth. One asset consisting of certain Denton County real estate, appears on both statements. It was valued at $1,800,000 *308 for 1974 and $1,944,000 for 1975, representing almost one-half of petitioner's alleged net worth (although the purported net value was considerably less in 1975). [4] Petitioner placed in evidence an appraisal dated November 3, 1973, of a tract of approximately 638 acres, apparently part of this Denton County property. The appraisal placed a value as of November 3, 1973, on the acreage without improvements described therein of $1,600,000 or approximately $2,500 per acre. On January 3, 1974, petitioner had conveyed a portion of this land to the K & K Land and Cattle Company, and only very vague evidence was introduced concerning his connection with that company, [5] *311 none of which indicates that petitioner owned its outstanding stock. Even if petitioner did in fact own an interest in this land, however, the financial statements nevertheless are so full of misrepresentations and omissions that they cannot, standing alone, support a finding that petitioner had the financial wherewithal on the respective dates in 1974 and 1975 to pay back his loans. For example, while the 1975 statement was dated March 19, 1975, it does not disclose the existence of a second lien on the Denton County real *309 estate, which was recorded on March 24, 1975, to secure a promissory note in the amount of $150,000 dated March 3, 1975.[6] Whether or not it was technically necessary to reflect the March 3rd note on a financial statement dated March 19, 1975, because that loan may not have been closed prior to March 24th, petitioner is bound to have known that the loan was in process; therefore the absence of this note is misleading at best. Moreover, the figures on the statements with respect to this property do not correspond to the $2,500 per acre appraised value. [7] The statements also reflected the existence of several notes receivable from individuals, totaling $231,961 on the 1975 statement, the amounts of which were almost unchanged according to petitioner's financial statements between 1974 and 1975. There is no evidence that these notes were sufficiently liquid to have any significant value. [8] Aside from the appraisal of the Denton County real estate, petitioners did not present any evidence in support of the values of the assets listed on the statements. [9] There is no evidence that the assets represented on the statements other than the Denton County real estate could actually have been *310 sold to pay debts when due. [10] *312 Between March and late August 1974, petitioner signed eight AMPI drafts totaling $360,059.33, which were made payable to J. T. Pressley or Bill Mohon (Pressley/Mohon drafts). This amount constituted that part of petitioners' deficiencies for 1974 attributable to AMPI transactions. Petitioner forged endorsements on the backs of these drafts and deposited the proceeds in his own account. Immediately prior to the first Pressley/Mohon draft, petitioner's balance due to AMPI was $206,303.79.He made payments to AMPI during 1974 totaling $543,134.02.After March 11, 1974, (the date on which the first Pressley/Mohon draft was reflected in AMPI's records), his payments to AMPI during 1974 were $419,491.74. As stated previously, petitioner's loan agreement with AMPI required him to expend the borrowed funds only to purchase cattle and to operate his cattle business. A notation in the upper left-hand corner of each of the Pressley/Mohon drafts indicates that those funds were for the purchase of specified cattle, but petitioner in fact must have used the proceeds of the drafts in *313 major part for various other purposes, which on this vague record may have included operating expenses, personal expenses or the payment of debts, perhaps including repayments to AMPI. Some part of the drafts may have been used for the purchase of cattle, but because of petitioner's failure to maintain adequate records, we cannot make such a finding. In early 1975, AMPI once again renewed petitioner's loan (the principal of which at this point was $812,546.08), this time apparently in reliance upon receipt of a security interest [11] *314 in additional cattle and a deed of trust on 615.973 acres of land held in the name of K & K Land and Cattle Company. [12] In connection with the latter, petitioner without authority signed an attorney's name to a letter warranting that the land was subject to only one prior lien in the amount of $700,000, without disclosing a second prior lien for $150,000. AMPI was not aware of the second mortgage until later when it determined that its interest in the land was not worth pursuing. [13] In early 1976, when AMPI tried to collect on its debt from petitioner by locating the cattle in which it supposedly had a security interest, petitioner told representatives of AMPI that there were no cattle. [14] *315 On June 10, 1976, AMPI sued petitioner, verious individuals, and five of petitioner's banks, alleging that AMPI was induced to renew petitioner's loan in 1975 in reliance upon false and fraudulent representations made by petitioner; that the various advances from AMPI to petitioner between 1971 and 1975 were made on the basis of false and fraudulent endorsements by petitioner; and that the various parties engaged in a conspiracy to defraud AMPI. AMPI received approximately $386,000 from its bonding company [15] and the defendants in partial settlement, and the suit was dismissed without prejudice. In his notices of deficiency issued to petitioners, respondent determined that the full amounts of the pressley/Mohon drafts were to be included in petitioners' community income for 1974. Blacklands
As with the AMPI transactions, petitioner did not maintain any books reflecting the loans from Blacklands so that much of the evidence remains ambiguous. Even in the absence of such records, however, the evidence does demonstrate a pattern of misrepresentation to Blacklands. This took *316 the form in part of apparent failure to own security promised, failure to disclose preexisting liens on security provided, and the providing of false financial statements to secure loans. Petitioner's first business transaction with Blacklands involved a note he had cosigned on behalf of one Wayne Kays, who had previously been employed by petitioner.In May 1974, petitioner as trustee of the Weldon and Lynn Knight Trust No. 1 (Trust) [16] applied for and obtained a loan and line of credit from Blacklands for more than $212,000 for the purpose of assuming the Wayne Kays loan [17] *317 and its accrued interest, purchase of cooperative stock, [18] payment for cattle in Wayne Kays' possession, and $60,000 for petitioner's future purchase of livestock. Petitioner individually guaranteed repayment. Petitioner represented that the proceeds received under this line of credit for the future purchase of livestock were to be used solely for the purchase of livestock [19] and the Blacklands would receive a security interest in the cattle purchased. [20]
In connection with this initial loan, petitioner as trustee of the Trust executed a note in the amount of $212,099.67 and granted to Blacklands a security interest in about 500 head of livestock worth $108,900, which were then in petitioner's possession. The cattle specified to be in petitioner's possession at that time did in fact exist. This initial loan thus appears to have been entirely regular in that the security provided ($108,900) exceeded the economic benefit that petitioner received (a line of credit for $60,000). Although other livestock security purportedly was provided by petitioner in succeeding *318 months, there is no evidence that petitioner actually owned the cattle specified. Between May and December 1974 (the only year at issue with regard to Blacklands), petitioner borrowed sufficient funds from Blacklands to have been required to have on hand to secure the total debt at least 3,000 head of cattle, yet other than the approximately 500 head referred to above, Blacklands was unable to locate any. Thus, the record does not show whether Blacklands received as security anything other than worthless pieces of paper, with the exception of that 500 head. By means of a line of credit and draft procedure similar to that used with AMPI, the Trust received in 1974 a total of $869,108.63 from Blacklands and executed six promissory notes [21] to Blacklands totaling $910,722.63 to reflect the line of credit. No funds were received by petitioner or the Trust from Blacklands after 1974. [22] *319 During the period May 1974 through February 1976, the Trust made the following payments to Blacklands: 1974
$287,217.55
1975
77,498.94
1976
26,743.47
Total
$391,459.96
By late 1974 or early 1975, Blacklands began to experience difficulty obtaining proof that cattle were being or had been purchased by petitioner with the borrowed funds. Petitioner provided Blacklands with financial statements indicating that petitioner and the Trust had a combined net worth on January 1, 1975, in excess of $4 million, [23] *320 yet these statements, like those furnished to AMPI, are inherently unreliable. Early in 1975, Blacklands became concerned that it would not be able to collect the money owed to its from the Trust. Upon informing Blacklands that some of the collateral in the form of cattle were nonexistent, petitioner transferred to Blacklands his interest in a note secured by 286.269 acres of Texas land in the amount of $731,991.75 as additional collateral to Blacklands. However, there was a large undisclosed lien on the land, substantially reducing its value. During January and February 1976, petitioner made repayments to Blacklands totaling $26,743.47. In February 1976, petitioner and the Trust entered into an agreement with Blacklands whereby all indebtendness between petitioner or the Trust and Blacklands was consolidated, and petitioner on behalf of the Trust and himself individually executed to Blacklands a promissory note in the amount of $512,699.77, the amount then due. In connection therewith, petitioner *321 furnished Blacklands with a security agreement, assigning an interest to Blacklands in shares of Bowie Industries, Inc., stock, a note from Bowie Industries, Inc., and shares of stock in Bowie International, Inc. He also gave Blacklands a deed of trust on some oil property as additional collateral for the loan. The Bowie Industries, Inc., stock may have had liens against it which petitioner had not disclosed, and the oil property was not owned by petitioner. Some time in 1976, Blacklands determined that its loan was uncollectible because none of the cattle purported to have been bought with the borrowed funds actually existed. By that time, to secure the Blacklands' borrowed funds petitioner should have had 3,000 steers on hand but none were located by Blacklands. [24] *322 On January 25, 1977, a default judgment was entered against petitioner in favor of Blacklands in the amount of $638,303.66. Blacklands collected additional amounts on petitioner's loans thereafter by selling collateral, and at the time of trial approximately $300,000 in principal was still due. Individuals
On December 12, 1974, petitioner, being very short of cash, obtained $40,000 from Mr. Floyd Doyle (Doyle) to pay off a farm mortgage loan petitioner had assumed that had become delinquent. In return, petitioner gave Doyle a deed of trust on the farm. The record is unclear as to whether petitioner made a commitment to Doyle promptly to pay off the existing farm mortgage loan. [25] *323 Petitioner did not pay off the mortgage loan and there was a foreclosure on the farm.In 1977, petitioner was indicted on charges of theft as a result of this transaction with Doyle. In his notices of deficiency issued to petitioners, respondent determined that the $40,000 petitioner received from Doyle constituted community income to petitioners for both 1974 and 1975. [26] By stipulation, respondent agreed that this amount constituted income to petitioners for only one year, not both. In September 1975, petitioner obtained $40,000 from Helen Duncan (Duncan). In exchange therefor, petitioner gave her a note secured by collateral that he did not own. The record does not reflect the exact circumstances that prompted this transaction, but as a whole it does indicate that petitioner was in dire financial straits at the time. Petitioner defaulted on the note, and in 1977 he was indicted for theft in connection with the Duncan transaction. Petitioner thereafter paid $20,000 to Duncan and gave her a promissory note for the remaining amount, and the State moved to dismiss the theft case in 1978. In his notices of deficiency issued to petitioners, respondent determined that the $40,000 received by petitioner from Duncan constituted community income to petitioners in 1975. On October 11, 1976, after a trial by jury, petitioner was found guilty of forging a partial release of a lien on some of his property that was subject to a deed of trust, and passing that forged document to another on March 19, 1974. On July 8, 1977, petitioner pled *324 guilty to a similar forgery that occurred on July 31, 1974. Between August 1975 and April 1978, 19 judgments were entered against petitioner for a total of $1,060,597.89 with interest and costs. Long-term Capital Gain
In his notices of deficiency issued to petitioners, respondent determined that petitioners had received a long-term capital gain of $31,250 in 1976 from the sale of stock and attributed one-half of this community income to each spouse. No evidence was presented at trial concerning this stock nor was this issue addressed by petitioners. OPINION I. Income from Purported Loans
A. Tax Liability of Petitioners Generally
In order to satisfy their burden of proving that the funds received from the various alleged creditors in this case other than Blacklands were not income to them, petitioners claim that the funds constituted loans and thus were not income to them under the doctrine of James v. United States,366 U.S. 213 (1961). The law is clear that-- When a taxpayer acquires earnings, lawfully or unlawfully, without the consensual recognition, express or implied, of an obligation to repay and without restriction as to their disposition, "he has received income which he *325 is required to return, even though it may still be claimed that he is not entitled to retain the money, and even though he may still be adjudged liable to restore its equivalent." [James v. United States,supra at 219 (quoting North American Oil Consolidated v. Burnet,286 U.S. 417, 424 (1932)).] In United States v. Rochelle,384 F.2d 748, 751 (5th Cir. 1967), the Fifth Circuit noted that the "economic benefit accruing to the taxpayer is the controlling factor in determining whether a gain is 'income.'" Thus, that court concluded, A loan does not in itself constitute income to the borrower, because whatever temporary economic benefit he derives from the use of the funds is offset by the corresponding obligation to repay them. See James v. United States, supra 266 U.S. at 219, 81 S.Ct. at 1055. Where the loans are obtained by fraud, and where it is apparent that the recipient recognizes no obligation to repay, the transaction becomes a "wrongful appropriation [and comes] within the broad sweep of 'gross income'". Ibid. [384 F.2d at 751.] See Bradley v. Commissioner,57 T.C. 1, 7 (1971). Thus, the mere fact that the transaction is termed a "loan" does not provide a means for a taxpayer *326 to escape taxation by cloaking an unlawful scheme in the guise of a loan. Leaf v. Commissioner,33 T.C. 1093, 1096 (1960). The existence of a loan depends not upon conclusory claims but upon whether the purported borrower in fact intended that the money advanced be repaid. United States v. Rosenthal,470 F.2d 837, 842 (2d Cir. 1972); Moore v. United States,412 F.2d 974, 978 (5th Cir. 1969); Commissioner v. Makransky,321 F.2d 598 (3d Cir. 1963), affg. 36 T.C. 446 (1961). With regard to the funds received from AMPI, petitioners do not deny that the endorsements on the back of the eight Pressley/Mohon drafts were forged by petitioner without authority or that petitioner did not in fact purchase cattle with the drafts as indicated on the face of each; rather, petitioners claim that the proceeds of these drafts were not income to them because petitioner intended at the time to repay the amounts to AMPI. We are not bound by mere statements of intent, however, where they are contrary to the evidence overall. United States v. Rosenthal,supra. See South Texas Rice Warehouse Co. v. Commissioner,366 F.2d 890, 897-898 (5th Cir. 1966), cert. denied 386 U.S. 1016 (1967). We conclude that *327 petitioner's financial collapse in late 1975, foretold at least as early as 1974, coupled with the series of misrepresentations to lenders and misuse of the borrowed funds which petitioner admits occurred prior to and during the years at issue, place a heavy burden on petitioners of showing that the requisite intent to repay AMPI and the individuals existed. On this record, this burden has not been met.To the contrary, the evidence in the record demonstrates a trend of misrepresentation and outright fraud in order to "borrow" from Peter to pay Paul, increasing as time went on, which indicates, if anything, a lack of intent to repay. See United States v. Rosenthal,supra.[27]
Petitioners' attempts to show that petitioner had the financial wherewithal to repay the loans fail for lack of proof. The assets on the financial statements in evidence were by petitioner's own admissions substantially overstated, and the liabilities understated. The numerous inaccuracies, estimations and inconsistencies discussed in the facts create further suspicion concerning their reliability. While petitioner attempted at trial to place a rough estimate *328 on the extent of these over- and understatements, the accuracy of his estimate is subject to serious question. In fact, petitioner's credibility as a witness is far from established. The value of the Denton County land also appears to be unclear despite the appraisal placed in evidence, especially in view of AMPI's determination not to pursue its interest. [28] Finally, the reduction of several claims to judgment between 1975 and 1978 creates the inference that other debts existed, at least some of which should have been but were not disclosed on the financial statements. [29] We thus have no way of knowing on this record whether at any time during 1974 or 1975 petitioner's net assets were sufficient to pay off any of the debts in question. Borrowing funds, without the ability to repay, on the basis of forged or fraudulent collateral and financial statements evidences a lack of consensual recognition of indebtedness. United States v. Rosenthal,supra.[30] *329 Notwithstanding this lack of proof, petitioners contend that the repayments to AMPI evidenced an intent to repay the Pressley/Mohon drafts. With regard to repayments during 1971 to 1973, we are not persuaded that they accurately reflect petitioner's intent during 1974, when the events leading to repondent's determinations regarding AMPI and Blacklands funds occurred. Whereas prior to 1973 petitioner appears to have treated his transactions with AMPI as bona fide loans, there was a distinct change in petitioner's behavior in late 1973 and early 1974, when a far more cavalier attitude was initiated. It was at this time that petitioner began to use the funds for purposes other than those permitted by his loan agreement. His quantity of draft writing increased dramatically at this time. From this we draw the conclusion that petitioner's prior repayments are not relevant to his intent during the year at issue. Moreover, in view of petitioner's admitted kiting history, the fact that certain sums were paid to AMPI during 1974 suggests that petitioner recognized that the best way to keep up the flow of cash and stave off lawsuits was *330 to make periodic repayments. [31] This is demonstrated by the fact that, while petitioner was making many of his repayments, he simultaneously was "borrowing" more funds from AMPI, Blacklands and others. [32]
The evidence as a whole creates a serious suspicion concerning petitioner's good faith during 1974 and 1975 in dealing with the various creditors. His misrepresentations extended throughout his relationships with them. He supplied them with inaccurate financial statements; he misrepresented the purposes for which he borrowed the money; he entered into security agreements to secure the loans, possibly without owning the purported security; he forged letters and drafts; and he provided collateral that either he did not own or was subject to substantial undisclosed liens. Petitioner's self-serving statements of *331 intent do not, when viewed in the context of the record as a whole, persuade us that he intended to repay AMPI. See United States v. Rosenthal,supra.
Our disposition with respect to petitioner's burden of proving intent to repay AMPI does not end the matter, however. The petitioners claim that in 1974 petitioner repaid to AMPI a substantial portion of the amount claimed by respondent to have been diverted to his own use during 1974. They base this contention on the fact that petitioner made eight repayments totaling $419,491.74 during 1974 after March 11, 1974, the date of the first Pressley/Mohon draft. If these repayments were first applied to petitioner's loan balance of $206,303.79 just prior to that date (as required by the loan agreement), and thereafter on a first-in/first-out basis to drafts written by or at the direction of petitioner, the argument runs, the funds alleged by respondent to have been diverted by petitioner in the Pressley/Mohon drafts were repaid in the amount of $133,254.11. Petitioners conclude therefrom that $133,254.11 of the allegedly diverted AMPI funds he received in 1974 were repaid in 1974 and therefore cannot be taxed as income to them for that *332 year. Respondent contends that these payments were merely part of petitioner's kiting scheme and were not intended as true repayments because at the same time that the 1974 payments at issue were being made more and more amounts were being obtained through the forged Pressley/Mohon drafts. On this issue we agree with petitioners. While it may be true that petitioner made these repayments in 1974 in order to be able to continue forging drafts, the fact remains that a partial restitution of the unlawfully obtained funds was made in the same year that those funds were received. The law is clear that embezzled funds constitute taxable income to the embezzler in the year of embezzlement. James v. United States,366 U.S. 213, 219-220 (1961); Leaf v. Commissioner,supra.When, however, the embezzled funds are partially returned to the victim in the year of embezzlement, there is a reduction in the embezzler's income for that year. See James v. United States,supra;Mais v. Commissioner,51 T.C. 494, 497-498 (1968); Leaf v. Commissioner,supra.[33] The facts of the instant case are sufficiently analogous to an embezzlement that the same result should obtain here. Therefore, petitioners' *333 income from the receipt of funds through the forged Pressley/Mohon drafts should have reflected the repayments made by petitioner in 1974 that were (on a first-in/first-out basis) [34] attributable to those drafts.Petitioners' income for 1974 in connection with the diverted AMPI funds as corrected thereby is $226,805.22. [35] *334 The circumstances surrounding the receipt of funds from Doyle and Duncan also are sufficiently questionable that we do not accept petitioner's testimony concerning his intent to repay those individuals as discharging his burden of proof. While not conclusive, the fact that both of these supposed lenders filed affidavits forming the basis for criminal complaints for theft certainly reveals their perspectives upon the transactions.On the whole, the record shows that petitioner may have misrepresented the facts to those two individuals, and he has presented no reliable evidence to negate such a conclusion or to show that he did in fact intend to repay them. Petitioner's testimony that in subsequent years he made payments to both of these persons is unconvincing of an intent to repay at the time he received the funds when viewed in the context of his misrepresentations and his apparently strapped financial situation in late 1974 and 1975 and the criminal complaints. [36] *335 For all of these reasons, we conclude that petitioners received taxable income during 1974 and 1975 as a result of the receipt of funds from AMPI, Doyle and Duncan, to the extent that those funds were not repaid during the year of receipt. With regard to transactions with Blacklands, however, respondent bears the burden of proving that petitioner did not intend to repay the loans. Were the burden on petitioners, we would reach the same result as we did concerning the other loans, at least as to a major portion of the Blacklands debt. The initial Blacklands loans occurred after many of the AMPI loans, and petitioner's financial state appears to have deteriorated as 1974 wore on. Neither does it appear that petitioner's manner of dealing with Blacklands on the whole was any more honest than it was with AMPI. Because the burden of proof lies with respondent, however, we reach a different result. This is not a case where the evidence concerning petitioner's lack of intent to repay is sufficiently persuasive that we are forced to conclude that he did not so intend. *336 The evidence is suggestiv e that the requisite intent was not present, but it is far from conclusive. We note, for example, that although in subsequent transactions with Blacklands petitioner displayed a significant amount of dishonesty, his initial loan from Blacklands for $212,099.67 in May 1974 appears to have been entirely regular. The financial statements supplied by petitioner to Blacklands were by petitioner's admission inaccurate, but we cannot say that respondent has proven on the basis of these statements or otherwise that petitioner clearly did not have the financial ability to repay B lacklands. For example, respondent had the opportunity affirmatively to challenge the appraisal of the Denton County real estate, but he did not do so. On a record as inconclusive as the one before us, we must hold that respondent has failed to meet his burden with regard to the Blacklands loans. B. Tax Liability of Petitioner Lynn Elaine Knight
Mrs. Knight attempts to insulate herself her husband's tax liability by showing that she was not directly involved in any of his loan transactions. However, during the years at issue petitioners resided in Texas, which is a state in which each *337 spouse is considered to be a one-half owner of community property, even though one spouse had no part in its acquisition. Johnson v. Commissioner,72 T.C. 340, 344 (1979). To the extent that the funds received b y her husband during the years at issue constituted community property, she is liable for the Federal income taxes on her share. Community property in Texas is defined broadly as property acquired by either spouse during the marriage other than "separate property." Tex. Fam. Code Ann., sec. 5.01(b) (Vernon 1975). A spouse's separate property includes that which was owned separately by the spouse before marriage, property acquired during the marriage by gift, devise, or descent, or recoveries by a spouse for personal injuries receiv ed during the marriage. Tex. Fam. Code Ann., sec. 5.01(a). See Tex. Const., Art. 16, sec. 15 (Supp. 1980). Property possessed by either spouse during the marriage is presumed to be community property. Tex. Fam. Code Ann., sec. 5.02. Thus, in order to prevail on this issue, Mrs. Knight bears the burden of demonstrating that the diverted funds received b y her husband which we have found to be income were not community property. Tex. Fam. Code Ann., sec. 5.21. *338 The funds in question clearly do not come within any of the specific statutory definitions of separate property. Her only recourse, [37] *339 therefore, in order to overcome the presumption created by statute, is to argue that the funds do not constitute community property because they were not "acquired" during the marriage, Tex. Fam. Code Ann., sec. 5.01(b), which in this case requires proof that legal title to the funds at issue was not acquired by petitioner, her husband. Johnson v. Commissioner,supra;Wrightsman v. Commissioner,111 F.2d 227, 228 (5th Cir. 1940). We recently addressed this same issue in Johnson v. Commissioner,supra, where we noted that, under Texas law, where property is acquired illegally, whether title passes to the illegal taker depends upon whether the original owner intended to pass legal title to the illegal taker. Johnson v. Commissioner,supra at 344; DeBlanc v. State,37 S.W. 2d 1024, 1027 (Tex. Crim. App. 1931). The facts in this case demonstrate amply that such intent was present here with respect to all of the purported loans to petitioner. The funds transferred to petitioner from the individuals were intended by those individuals for petitioner. The funds received from AMPI were transferred in reliance upon an agreement that petitioner would return those funds to AMPI by a specified date. As far as AMPI was concerned the money was for the payment of petitioner's obligations in his business. Thus the fact that the AMPI drafts were (albeit falsely) made payable to third parties is of little significance. [38] *340 We conclude, therefore, that all of the allegedly borrowed funds obtained and not returned in the year of receipt by petitioner during 1974 and 1975 from AMPI, Doyle and Duncan constituted community income, taxable one-half to Mrs. Knight and one-half to petitioner. II. Capital Gain Income
Respondent in his notice of deficiency determined an increase in petitioners' 1976 *341 community income of $31,250 because of a capital gain from the sale of stock. Petitioners bear the burden of proof. Rule 142(a). This issue was not raised by petitioners in their petition nor addressed by them at trial or on brief. Accordingly, respondent's determination is affirmed. III. Interest Deductions for 1974 and 1976
In their post-trial brief petitioners raised an issue not raised at any time before in their petition or at trial, involving their entitlement to a deduction under section 163 for alleged interest payments made to AMPI and Blacklands during 1974 and to Blacklands in 1976. Under rules of this Court, any issue not raised in the petition shall be deemed to be conceded. Rule 34(b)(4). We repeatedly have stated that we will not consider issues not appearing in the pleadings and raised for the first time by briefs. E.g., McMaster v. Commissioner,69 T.C. 952, 956-957 (1978); Aero Rental v. Commissioner,64 T.C. 331, 338 (1975); Molbreak v. Commissioner,61 T.C. 382, 393 (1973), affd. per curiam 509 F.2d 616 (7th Cir. 1975). Accordingly, we hold for respondent on this issue. IV. Additions to Tax[39] *342 A. Section 6651(a)
The evidence is undisputed that petitioners did not file Federal income tax teturns for 1974, 1975 or 1976. Petitioner testified only that his reasons failing to file involved an unconfirmed belief that he did not own any tax, the "trauma" of all his problems and the fact that, unless someone was pressuring him to do something, he did not do it. Mrs. Knight did not testify and offered no explanation for her failure to file. In view of petitioners' failure to introduce satisfactory evidence of reasonable cause for their failure to file tax returns within the meaning of section 6651(a), respondent's imposition of the additions under that subsection was correct. B. Sections 6653(a) and 6654(a)
Petitioners bear the burden of proving that respondent's imposition of additions to tax under sections 6653(a) and 6654(a) was incorrect. Rule 142(a). Petitioner's cavalier attitude toward his financial transactions, if anything, would demonstrate sufficient negligence to justify an addition to tax under section 6653(a), even if they did not bear such a burden. *343 They presented insufficient evidence in support of their burden under section 6653(a), and no evidence converning the addition for failure to pay estimated tax. We therefore affirm respondent's determination with respect to both petitioners that these additions should be imposed. Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the years at issue, and all rule references are to the Tax Court Rules of Practice and Procedure.
2. To the extent that the terms "loan," "debt," "barrowed," "principal" or "interest" are used to refer to the transactions at issue, they are employed merely for convenience and do not bear on the issue of whether those transactions were loans for tax purposes.↩
3. We use this expression for convenience only and do not intend to attach any legal significance to our use of the term.↩
4. On July 11, 1974, petitioner executed a note for $700,000 to the Federal Land Bank of Houston secured by this Denton County real estate, and on March 3, 1975, petitioner executed another note to the Dallas International Bank for $150,000, also secured by this property.The first obligation was reflected on the 1975 statement, but the second debt was not. Neither was an outstanding obligation on March 19, 1974, although it is probable that petitioner knew on that date that it would be necessary to mortgage a substantial portion of this property in the near future. These obligations did, in any event, substantially reduce the alleged net value of the property at least as early as July 11, 1974. See also footnote 7, infra.↩
5. In their brief petitioners indicated that he had transferred this land to the K & K Land and Cattle Company in order to make it available to his creditors, which otherwise would not have been possible under the Texas Homestead laws. We cannot, however, treat such statements as evidence. Certain documents indicate that petitioner was the president of this corporation, and that the corporation did transfer by deed of trust its interest in the land to some of petitioner's creditors. 6. See footnote 4, supra.↩
7. The 1974 statement indicates ownership of 684 acres, whereas the 1975 statement reflects 648 acres. Multiplying these figures by the $2,500 per acre appraised value results in land values of $1,710,000 and $1,620,000, respectively. Petitioner indicated at trial that he could not recall on what basis he represented the substantially higher figures on the financial statements. It is likely that he may have added additional amounts to the appraised land value for the value of improvements not reflected in the appraisal. However, he neither provided any support for these figures nor explained why in 1975 he "added" $324,000 for the improvements, but in 1974 "added" only $90,000. ↩
8. Two of these notes, totaling over $100,000, had remained almost the same between 1970 and 1975. ↩
9. Petitioner testified that the figures contained on the statements reflected his personal view of values, but this must be viewed in the light of his admission that assets were overvalued and liabilities understated. ↩
10. To the contrary, petitioner testified that, by late 1975, he did not have the financial wherewithal to pay his debts, yet he presented no evidence to explain how he had been able to represent that he had a $4.5 million net worth earlier that year.
11. The record is not entirely clear that a "security interest" within the meaning of the Uniform Commercial Code was in fact created in any of the transactions at issue in this proceeding. We therefore use this term for convenience only because the parties did so. 12. See text accompanying footnotes 4-6, supra.↩
13. This fact obviously places the reliability of the $2,500/acre appraisal in question, since 615.973 x $2,500 = $1,539,932, which is substantially in excess of the two prior liens.↩
14. An AMPI representative testified that, upon investigation with purported sellers of cattle, he discovered that no cattle had been sold to petitioner. Petitioner testified that he did not know how many cattle he purchased during the years at issue. He did know, however, that he did not purchase as many cattle as he said he had purchased, and that, by the end of 1975, he had only approximately 400 head, when he should have 4,500 head in light of the obligations he had incurred by that time. 15. The claims against the bonding company were for the forged Pressley/Mohon drafts on petitioner's account and employee dishonesty (because the AMPI loan officer who verified petitioner's loans had indicated that petitioner did have the cattle securing the loans when he apparently did not).↩
16. Petitioner testified that Blacklands was "looking to" him for repayment.The Trust was for the benefit of petitioners' children. ↩
17. The evidence does not reveal why petitioner through the Trust assumed this loan or whether petitioner received anything in exchange therefor. 18. In order to obtain the Blacklands loans, petitioner was required to pourchase stock in the cooperative. ↩
19. A Blacklands representative testified that its own rules required that funds could be advanced only for agricultural commodities and that petitioner was clearly so informed. ↩
20. See footnote 11, supra.↩ Where petitioner deposited draft proceeds into his own account, Blacklands believed that it obtained a security agreement to cover the collateral purportedly purchased.
21. The first of these notes constituted the initial loan and line of credit of $212,099.67. ↩
22. The record reflects a payment to petitioner of $2.50 on April 21, 1975, for legal fees, but this was the only disbursement for either the year 1975 or 1976.
23. The financial statement of petitioner as an individual is almost identical to the one petitioner furnished to AMPI concerning his net worth on the same date. The differences are that the AMPI statement reflects a cattle asset value of $907,000, whereas the Blacklands statement valued petitioner's cattle at $682,000. The Blacklands statement (and not the AMPI statement) also indicates that it does not reflect assets or liabilities in a partnership with which petitioner had some connection or some secured contingent liabilities of the Trust. While it would appear based on petitioner's testimony that the Blacklands statement is more accurate than the AMPI statement, we have no way of determining from this record that the Blacklands statement is accurate. In any event, the values for the most part are petitioner's estimates and are of dubious reliability. Petitioner provided no evidence concerning the Trust's financial condition.
24. This 3,000-head estimate by a Blacklands representative does not take into account any security interests in cattle already purportedly held by AMPI.
25. At trial petitioner stated that he had represented to Doyle that, after petitioner paid off the farm mortgage loan (secured by a first lien on the farm), Doyle would have a first lien on the property, although there is some indication in the record that he may not have made such a representation. 26. Although petitioner testified that he repaid Doyle $17,500, there is no other evidence in the record that he did so or when he did so.↩
27. See also McDaniel v. Commissioner,T.C. Memo. 1977-256↩.
28. See Footnote 13 and accompanying text, supra.↩
29. We note, for example, that the Doyle "loan" of $40,000, which arose on Dec. 12, 1974, is not reflected on petitioner's statements as of Jan. 1, 1975.↩
30. See also O'Sheeran v. Commissioner,T.C. Memo. 1983-702; Breckenridge v. Commissioner,T.C. Memo. 1983-66↩.
31. See O'Sheeran v. Commissioner,supra;Pisello v. Commissioner,T.C. Memo. 1979-143; Klahr v. Commissioner,T.C. Memo. 1968-245↩. 32. For example, a payment to AMPI was made on April 2, 1974, in the amount of $91,000 by means of petitioner's check dated March 31, 1974, but on March 29, 1974, petitioner had already drawn $83,800 of AMPI funds in one of the Pressley/Mohon drafts.↩
33. See also Stovall v. Commissioner,T.C. Memo. 1983-450↩. 34. The original AMPI loan agreement provided that all payments would be applied first to unpaid principal.↩
35. This figure was reached by applying the sum of payments to AMPI during 1974 after the first Pressley/Mohon draft of March 11, 1974 ($419,491.74), to petitioner's loan balance immediately before the first Pressley/Mohon draft ($206,303.79), and applying the balance of the repayments to all drafts made after that date in chronological order until the repayments are used up. Any amounts received from the Pressley/Mohon Drafts thereafter constituted income. In making this computation, we note that the AMPI records in evidence unexplainably contain two summaries of petitioner's transactions for this period, which apparently use two different accounting entries for some of the same transactions. We use here the summary apparently used by petitioners as best reflecting actual repayments, which seems particularly reliable in view of the fact that it results in a smaller repayments figure.
36. Because the issue is not before us, we express no view as to whether these alleged repayments entitle petitioners to a deduction in the year of repayment.
37. Petitioners also raised the contention that, because certain of the husband's "loan" agreements explicitly are governed by the laws of Oklahoma, the Texas community property laws do not apply. We note, however, that, under conflict of laws principles, the determination of the statute of movable as community property or separate property is made under the law of the state of the domicile of the parties. Tirado v. Tirado,357 S.W. 2d 468, 471 (Tex. Civ. App. 1962); see McClanahan, Community Property Law in the United States, sec. 13.2 (1982). The parties have stipulated that petitioners were residents of Texas during all relevant years, and there is no evidence in the record that they were domiciled elsewhere. Therefore, this argument clearly has no merit.
38. This distinguishing characteristic makes part of the holding in Johnson v. Commissioner,72 T.C. 340 (1979), cited by petitioners in their brief, inapposite. In Johnson, we held that the taxpayers did not acquire title to tax refund checks made payable to others, because, "when the Government mailed the refund checks, it intended to pass possession and title to these checks only to the taxpayers whose names were on the checks and to no one else." 72 T.C. at 346↩. Here, in contract, petitioner was responsible for repayment of the funds, even though the Pressley/Mohon drafts were made out to others for petitioner's purported convenience. Thus, the existence of a third-party payee here is inconsequential. Indeed, petitioner admitted that it was his customary procedure to make the drafts payable to himself or his bank and only on rare occasions did he use a third-party payee.
39. The amount of the additions imposed in the Notice of Deficiency will, of course, have to be adjusted under Rule 155 to reflect respondent's concessions as well as our opinion.