MARY HELEN JOHNSON, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 10423–76.     Filed May 14, 1979.

*Towner Leeper*, for the petitioner.
*James N. Mullen*, for the respondent.

FAY, *Judge:* Respondent determined a deficiency in petitioner's Federal income tax for the taxable year 1973 in the amount of $11,643. Concessions having been made, the only remaining issues for decision are:

(1) Whether illegal income obtained by petitioner's husband in a false Federal income tax refund scheme constitutes community property and, hence, income to the petitioner.

(2) Whether petitioner is entitled to deduct under section 162[1] or section 212 a portion of the legal fees paid to defend her husband against criminal charges brought as a result of his participation in the false refund scheme.

### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

At the time of filing her petition herein, Mary Helen Johnson resided in El Paso, Tex. Throughout 1973, petitioner was married to Jerry E. Johnson (Johnson). For the taxable year 1973, petitioner filed a separate Federal income tax return.

During 1973, petitioner's husband was involved with two other individuals in a scheme to defraud the Federal Government by filing false income tax refund claims with the Internal Revenue Service. Petitioner did not participate in or know of this scheme. The two other individuals involved in the scheme were an Internal Revenue Service employee, Cora Fraley Baggett (Baggett), and her brother John T. Fraley (Fraley).

The scheme began when Fraley learned that his sister, Baggett, who worked at the Internal Revenue Center in Austin, Tex., had generated false refund checks for several other members of their family. Thereafter, Fraley persuaded her to do the same for him and Johnson. The refund checks were generated as follows: Baggett researched the microfilms at the Service Center and located taxpayers with names similar to Fraley and Johnson. She then made a master file change, altering the addresses of the real taxpayers to addresses

---

[1] All statutory references are to the Internal Revenue Code of 1954, as amended, and in force during the years in issue.

supplied to her by Fraley. She would then prepare false claims on a refund claim form, Form 843, or file a false amended return, Form 1040X. These false claims usually reflected a casualty loss. Baggett would approve the false claims, and refund checks in the amounts claimed would be made out by the Government in the name of the real taxpayers and mailed to the addresses provided by Fraley.

To enable them to negotiate the checks, Fraley and Johnson opened numerous bank accounts in Texas, New Mexico, and Indiana. Most of these accounts were joint accounts in which fictitious women's names were used as their wives. When necessary, the women's names would be signed by Fraley or Johnson. When a refund check was received in the mail, it would be deposited by Fraley or Johnson in one of these bank accounts. After a short period of time, the balance in an account would be withdrawn and Fraley and Johnson would divide the proceeds.

In addition to the false claims Baggett prepared using other taxpayers' names, she also prepared four false refund claims using petitioner's and her husband's actual names. These four claims covered the years 1966, 1968, 1969, and 1970. Four refund checks dated August 31, 1973, and made payable to petitioner and her husband were mailed to them. These four checks totaled $6,180.51. Petitioner's husband signed both his and petitioner's name to these checks and cashed them at a bank in El Paso, Tex.

Johnson's share of the total proceeds from this scheme during 1973 was $59,595.77.

Sometime during 1973, the fraudulent scheme was discovered and a criminal information was subsequently filed against Baggett charging her with conspiracy to commit an offense, 18 U.S.C. sec. 371, and making a false claim upon an agency of the United States, 18 U.S.C. sec. 287. She pleaded guilty to both counts. In addition, Fraley and Johnson were charged with conspiracy to defraud the Government, 18 U.S.C. sec. 286, and they too pleaded guilty.

In connection with his defense to the charge of conspiracy, petitioner's husband incurred $7,001 in legal fees. To pay this amount, petitioner and her husband on November 22, 1973,

transferred a 1974 Cadillac convertible to the attorney who represented him.[2]

Prior to the time petitioner filed her Federal income tax return for 1973, she learned of her husband's involvement in the fraudulent refund scheme. Thus, on her separate return for 1973, petitioner stated that her husband had $9,419 in illegal income for the year and she included one-half, $4,709, as her community income. In addition, petitioner claimed one-half of the legal fees as a deduction.

In the statutory notice, respondent determined that petitioner's husband's illegal income for 1973 amounted to $59,595.77 and that petitioner was taxable on one-half of this amount or $29,797.89 less the $4,709 already included. Respondent also disallowed the deduction for legal expenses.

OPINION

The first issue we must decide is whether the illegal income obtained by petitioner's husband in a false income tax refund scheme constitutes community property and, hence, income to the petitioner.

Texas is a community property state. Tex. Const. art. 16, sec. 15; Tex. Fam. Code Ann. sec. 5.01 et seq. (Vernon 1974). Under Texas law, community property is defined as all property acquired by either spouse during marriage except for property acquired by gift, devise, descent, or in recovery for personal injuries sustained by a spouse during marriage. Tex. Fam. Code Ann. sec. 5.01 (Vernon 1974). These latter categories constitute a spouse's separate property. Tex. Fam. Code Ann. sec. 5.01 (Vernon 1974).

With respect to community property, each spouse has a vested interest in and is owner of one-half of all such property. *Hopkins v. Bacon*, 282 U.S. 122, 126 (1930); *Lange v. Phinney*, 507 F.2d 1000, 1005 (5th Cir. 1975); *Dillard v. Dillard*, 341 S.W.2d 668, 670 (Tex. Civ. App. 1961). As a result of her ownership of one-half of all community property, a wife is liable for the Federal income taxes on such share. *United States v. Mitchell*, 403 U.S. 190, 196 (1971); *Hopkins v. Bacon, supra* at 127; *Poe v. Seaborn*, 282 U.S. 101, 118 (1930); *Lange v. Phinney, supra*. Therefore, in the

---

[2]The record also shows that a 1972 Cadillac owned by petitioner was seized and sold by the Internal Revenue Service in payment of certain taxes.

present case, if the illegal income earned by her husband is community property, petitioner is taxable on one-half of such amount even though she had no part in its acquisition.[3] Conversely, if the illegal income is her husband's separate property, petitioner is not liable for any tax on such amounts because she has no ownership interest in his separate property. Tex. Fam. Code Ann. sec. 5.21 (Vernon 1974). See *Blake v. Commissioner*, 20 T.C. 721, 731 (1953); *O'Connor v. Commissioner*, 40 B.T.A. 489, 490 (1939), affd. 110 F.2d 652 (5th Cir. 1940).

As provided in sec. 5.01 of the Texas Family Code, property must be "acquired" during marriage to constitute community property. It is a well-established rule in Texas that the word "acquired" as it is used in this statute refers to the origin or inception of title. *Wrightsman v. Commissioner*, 111 F.2d 227, 228 (5th Cir. 1940); *Lee v. Lee*, 247 S.W. 828, 832 (1923). See also Speer, Texas Family Law, sec. 15:7 (5th ed. 1976). Consequently, a spouse who acquires property during marriage must acquire some legal title to the property before such property will be characterized as community property. *Wrightsman v. Commissioner, supra.* Hence, if a spouse acquires possession of property without title, the property remains the separate property of such spouse. *Wrightsman v. Commissioner, supra.*

With these principles in mind, the resolution of the first issue in this case depends on whether petitioner's husband acquired title to his share of the proceeds derived from the false refund scheme. Since the nature of an individual's legal interest in property is a matter of State law, we must look to Texas law to determine whether petitioner's husband acquired title to these proceeds. *United States v. Mitchell, supra* at 197 (1971); *Aquilino v. United States*, 363 U.S. 509, 513 (1960); *Estate of Williams v. Commissioner*, 62 T.C. 400, 407 (1974).

Under Texas law, where property is acquired illegally, whether title to such property passes to the illegal taker depends on whether the owner intended to pass both possession and title to the illegal taker. *De Blanc v. State*, 118 Tex. Crim. 628, 37 S.W.2d 1024, 1027 (1931). See also *Roe v. State*, 140 Tex. Crim. 299, 144

---

[3] It has been well settled for a number of years that income earned illegally is taxable. *James v. United States*, 366 U.S. 213, 219 (1961); *Rutkin v. United States*, 343 U.S. 130, 137 (1952); *Nerem v. Commissioner*, 41 T.C. 338, 341 (1963). See also *Galliher v. Commissioner*, 62 _.C. 760, 764 (1974), affd. 512 F.2d 1404 (5th Cir. 1975), cert. denied 423 U.S. 988 (1975); *Hill v. Commissioner*, 32 T.C. 254, 255 (1959).

S.W.2d 1104, 1107 (1940); *Lovine v. State*, 136 Tex. Crim. 32, 122 S.W.2d 1069, 1070 (1939); *Baldwin v. State*, 132 Tex. Crim. 427, 104 S.W.2d 872, 873 (1937); *Hoovel v. State*, 125 Tex. Crim. 545, 69 S.W.2d 104, 109 (1934); *Shelton v. Thomas*, 11 S.W.2d 254, 257 (Tex. Civ. App. 1928).

In *De Blanc v. State, supra,* the appellant was employed as a bank messenger by the Texas Bank & Trust Co. (Texas) in Austin, Tex. His duty was to carry money transfers between Texas and other local banks. On one occasion, while acting without authority, the appellant presented a transfer request for $5,000 to the Austin National Bank (Austin). Upon obtaining the money, he converted it to his own use. The appellant was subsequently convicted of theft. On appeal, the appellant argued that he had obtained title as well as possession of the money and, therefore, he was not guilty of theft.[4] The court held that, based on the evidence presented, it was clear Austin did not intend to vest title to the funds in the appellant since Austin made the transfer to the appellant only because of his false representation that he had the authority to receive the money on behalf of Texas, and his implied assurance that he would turn the money over to Texas. Relying on its conclusion that title did not pass to the appellant, the court affirmed his conviction for theft.

In the present case, respondent contends that the Government was induced by the fraudulent representations made by Baggett, Fraley, and Johnson to pass both possession and title to the refund checks to these three individuals.[5] Petitioner, on the other hand, argues that her husband merely misappropriated Government funds and in so doing obtained possession only of the refund checks.

---

[4]At the time of *De Blanc v. State*, 118 Tex. Crim. 628, 37 S.W.2d 1024 (1931), passage of title was the distinction between the crimes of theft and swindling in Texas. If title did not pass, the crime was theft, but if title did pass, the crime was swindling. See *Segal v. State*, 98 Tex. Crim. 485, ___, 265 S.W. 911, 912 (1924). This distinction was subsequently abandoned by the Texas courts. See *Bomar v. Insurors Indemnity & Ins. Co.*, 150 Tex. 484, 242 S.W.2d 160, 162 (1951).

[5]Respondent also contends that under the former Texas Penal Code, which was in effect during 1973, Baggett, Fraley, and Johnson would have been guilty of the crime of swindling and, therefore, title to the refund checks passed to them. This contention is apparently based on respondent's belief that when the crime is swindling, title is deemed to pass. However, under Texas law title does not pass merely because the crime committed is swindling; when title passes it is because a court has concluded on the evidence presented that title passes. See *Bomar v. Insurors Indemnity & Ins. Co., supra* at 163; *Imperial Ins. Co. v. Ellington*, 498 S.W.2d 368, 372 (Tex. Civ. App. 1973); *De Blanc v. State, supra* at 1028. We, therefore, must consider the evidence presented in the instant case to determine whether title passed. We cannot simply conclude that title passed because Baggett, Fraley, and Johnson may have been guilty of swindling under Texas law.

Following the approach adopted by the Texas courts, whether petitioner's husband obtained title to the refund checks depends on whether the Government intended to pass both possession and title to these checks to him. Having considered all the facts in the present case, we conclude that with respect to the four refund checks totaling $6,180.51 made payable to petitioner and her husband, the Government intended to pass both possession and title to these checks to them. However, with respect to the other refund checks we conclude that the Government did not intend to pass possession and title to these checks to petitioner's husband.

A key factor in our determination was the manner in which Baggett, Fraley, and Johnson obtained the refund checks from the Government. To induce the Government to issue the checks, Baggett prepared false refund claims and amended returns that usually showed a casualty loss. In preparing these claims, she used the names of taxpayers obtained from the master file at the Internal Revenue Service where she worked and addresses supplied to her by her brother. Baggett then submitted the refund claims and approved them for payment. This scheme is similar to the scheme employed by the bank messenger in *De Blanc v. State, supra,* in that without the false representations Baggett, Fraley, and Johnson would not have been able to obtain the checks from the Government.

Moreover, in *De Blanc,* the court held that title did not pass to the bank messenger because Austin transferred the money to him only because of his false representation that he had the authority to receive the money on behalf of Texas and his implied assurance that he would turn the money over to Texas. Similarly, in the present case, because of the false representations made by Baggett, Fraley, and Johnson, the Government believed it was issuing the checks to taxpayers with bona fide refund claims. Hence, we conclude that when the Government mailed the refund checks, it intended to pass possession and title to these checks only to the taxpayers whose names were on the checks and to no one else.

We, therefore, hold that with respect to the checks made payable to other taxpayers, petitioner's husband did not acquire title to these checks. However, with respect to the four checks made payable to petitioner and her husband, we hold that they did acquire title to these checks.

Since the petitioner and her husband acquired title to the four refund checks totaling $6,180.51, this amount constitutes community property. As a result, petitioner is taxable on one-half of this amount.

The second issue for our decision is whether petitioner is entitled to deduct under section 162 or section 212 a portion of the legal fees paid to defend her husband against criminal charges brought as a result of his participation in the refund scheme.

In connection with his defense against the charge of conspiracy to defraud the Government, petitioner's husband incurred $7,001 in legal fees. This amount was paid by petitioner and her husband when they transferred a 1974 Cadillac convertible to his attorney in 1973.

Respondent contends that petitioner is not entitled to a deduction for these legal fees under either section 162 or section 212. Petitioner, citing *Commissioner v. Tellier*, 383 U.S. 687 (1966), argues that legal expenses incurred in connection with the unsuccessful defense of a criminal prosecution are deductible.

Generally speaking, since Texas is a community property State, for Federal income tax purposes each spouse is entitled to a deduction for one-half of all the expenses properly chargeable against community income. *Stewart v. Commissioner*, 35 B.T.A. 406, 411 (1937), affd. 95 F.2d 821 (5th Cir. 1938). Moreover, while we recognize that since the Supreme Court's decision in *Commissioner v. Tellier, supra,* there is no longer any public policy objection to the deduction of legal expenses incurred in the unsuccessful defense of criminal charges, such expenses to be deductible must still meet the requirements of either section 162 or section 212.

Section 162(a) allows a deduction for ordinary and necessary expenses paid or incurred during the taxable year in "carrying on any trade or business." Closely related to that provision, section 212(1) allows a deduction for ordinary and necessary expenses paid or incurred during the taxable year "for the production or collection of income." While both sections refer to the same kinds of deductible expenses, this latter section makes those deductions allowable with respect to income-producing or profit-seeking activities which do not constitute a trade or business. *United States v. Gilmore*, 372 U.S. 39, 44–45 (1963);

*Trust of Bingham v. Commissioner*, 325 U.S. 365, 374 (1945); *Rafter v. Commissioner*, 60 T.C. 1, 8 (1973), affd. 489 F.2d 752 (2d Cir. 1974), cert. denied 419 U.S. 826 (1974). The purpose of the two sections was "to place all income-producing activities on an equal footing" in terms of allowable deductions. *United States v. Gilmore, supra* at 49; *Trust of Bingham v. Commissioner, supra; Rafter v. Commissioner, supra.* However, both sections must be applied in light of section 262 which disallows deductions for expenses that are personal in nature.

In *United States v. Gilmore, supra,* the Supreme Court stated that the characterization of litigation expenses incurred in resisting a claim as "business" or "personal" depends on whether or not the claim arises in connection with the taxpayer's income-producing activities. *United States v. Gilmore, supra* at 49. Thus, the controlling criteria are the origin and character of the controversy which led to the expense rather than the potential consequences to the taxpayer of failing to defend the litigation. *United States v. Gilmore, supra* at 49.

Whether petitioner may deduct a portion of the legal expenses under section 212(1) depends on whether such expenses were incurred by her husband in connection with the collection or production of income. More specifically, in light of *United States v. Gilmore, supra,* the question is whether the criminal prosecution brought against petitioner's husband which led to the expenses arose in connection with his profit-seeking activities.

It is evident that the criminal prosecution brought against petitioner's husband stemmed directly from his attempt to obtain income illegally through the refund scheme. Thus, applying the Supreme Court's test in *United States v. Gilmore, supra,* we conclude that petitioner's husband's legal expenses arose in connection with the production of income within the meaning of section 212(1).

In *Commissioner v. Tellier, supra,* the Supreme Court held that where the requirements of section 162(a) were satisfied, legal expenses incurred in connection with the unsuccessful defense of criminal charges were deductible. Since the purpose of section 162 and section 212 is to put all income-producing activity on equal footing in terms of allowable deductions, we believe the holding in *Commissioner v. Tellier, supra,* applies to legal expenses incurred in the unsuccessful defense of criminal

charges stemming from the production of income under section 212(1).

At trial, petitioner conceded that to the extent the income her husband received from the illegal scheme was his separate property she was not entitled to a deduction for the legal expenses attributable to such separate property. Since we have determined that only $6,181.51 of the $59,595.77 that petitioner's husband derived from the refund scheme is community income, we conclude that only a proportionate share of the legal expenses are deductible by petitioner as expenses incurred in connection with the production of this community income. See *Stewart v. Commissioner, supra; Wrightsman v. Commissioner,* 40 B.T.A. 502, 507 (1939), affd. 111 F.2d 227 (5th Cir. 1940). We, therefore, hold that petitioner is entitled to deduct under section 212(1) $363.03 of the $7,001 in legal fees paid to defend her husband against the criminal charges brought as a result of his participation in the fraudulent refund scheme.[6]

To reflect the foregoing,

*Decision will be entered under Rule 155.*

---

[6] In calculating the amount deductible we used the following formula:

The result of this calculation, $726.05, was then divided in half to obtain petitioner's deductible share of the expenses attributable to the community income.