T.C. Memo. 1996-96


UNITED STATES TAX COURT


LLOYD E. DAWSON, JR., Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 14892-92, 10613-93.[1]    Filed March 4, 1996.


<u>Charles Gordon Reed</u>, for petitioner.

<u>Steven M. Diamond</u> and <u>Wanda Cohen</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


WELLS, <u>Judge</u>:  Respondent determined the following deficiencies in, and additions to, petitioner's Federal income taxes:

---

[1]

These cases, hereinafter referred to as the instant case, have been consolidated for purposes of trial, briefing, and opinion.

|  | | Additions to Tax | | | | Penalty |
| Year | Deficiency | Sec. 6651(a)(1) | Sec. 6653(a)(1) | Sec. 6654 | Sec. 6661 | Sec. 6662(a) |
|------|-----------|-----------------|-----------------|-----------|-----------|-------------|
| 1988 | $57,984 | -0- | $40 | -0- | $14,051 | -0- |
| 1989 | 14,202 | $1,445 | -0- | $922 | -0- | $2,840 |

After concessions, the only issues remaining for decision are: (1) Whether petitioner is entitled to "innocent spouse" relief from liability for the understatement of tax attributable to funds his former wife Katy Dawson embezzled during 1988; and (2) whether funds embezzled by Ms. Dawson during 1989 constitute community income, one half of which is taxable to petitioner.

FINDINGS OF FACT

Some of the facts have been stipulated for trial pursuant to Rule 91.[2] The parties' stipulations are incorporated in this Memorandum Opinion by reference and are found accordingly.

General Background

At the time of the filing of the petitions herein, petitioner resided in Orange, Texas.

From September 1972 through January 1982, petitioner was employed by the U.S. Navy and, from January 1982 through February 1994, was employed by Gulf States Utilities as a power plant operator and control operations foreman.

---

[2] Unless otherwise indicated, all Rule references are to the Tax Court Rules of Practice and Procedure, and all section references are to the Internal Revenue Code in effect for the years in issue.

Petitioner married Ms. Dawson on October 16, 1982, and the marriage continued through the years in issue.  Petitioner and Ms. Dawson had two daughters who lived with them during the years in issue.

Bank Accounts Maintained and Certain Borrowing by Petitioner and Ms. Dawson

During the years in issue, petitioner and Ms. Dawson maintained a joint checking account with Mid County Teachers Credit Union, Port Neches, Texas (Mid County Teachers), for which both petitioner and Ms. Dawson had signature authority and on which petitioner wrote checks.  Petitioner and Ms. Dawson maintained a joint account with Texaco Port Arthur Works Employees' Federal Credit Union, Port Arthur, Texas (Texaco P.A.W.).  Ms. Dawson was primary account holder and petitioner was joint owner of the account, which included a joint savings account and a joint checking account.[3]  Both petitioner and Ms. Dawson had signature authority for the joint checking account, and petitioner wrote checks on the account.  Petitioner and Ms. Dawson maintained another joint account with Texaco P.A.W. Petitioner was primary account holder and Ms. Dawson was joint owner of the account.  Petitioner, Ms. Dawson, and Pauline

---

[3]

Although the parties stipulated that the joint account included both a checking and a savings account, they did not further explain that account arrangement.

Dupree, Ms. Dawson's mother, had signature authority for the joint account.

The statements for the foregoing accounts were mailed to the residence of petitioner and Ms. Dawson.  Petitioner opened and looked at some of the statements.  Petitioner also knew where the statements were kept at their residence, and he was able to review them whenever he desired.

Beginning March 15, 1989, and continuing thereafter through the remainder of 1989, petitioner and Ms. Dawson maintained a joint checking account with First National Bank of Mid County.  Both petitioner and Ms. Dawson had signature authority for the joint checking account.  Petitioner wrote checks on the account to pay family bills.  The statements for the account were also sent to petitioner's residence.  Petitioner reviewed and reconciled the statements.

On October 22, 1987, a home improvement loan from Texaco P.A.W. to petitioner and Ms. Dawson in the amount of $7,520.34 was outstanding.  On that date, petitioner and Ms. Dawson applied for and received an additional home improvement loan in the amount of $15,191.69 from Texaco P.A.W. and refinanced the outstanding balance of the earlier home improvement loan.  The new balance of the home improvement loan they received on that date thus became $22,712.03.

Facts With Respect to Ms. Dawson's Employers

Ms. Dawson was employed by Port Arthur Home Health Services (PAHHS) and Beaumont Home Health Services (BHHS) from 1977 until July 17, 1989. The corporations were wholly owned and/or operated by Dr. Ruth Constant (Dr. Constant). During 1988 and 1989, Ms. Dawson was employed by PAHHS and BHHS as an accounting supervisor and was the second person in charge of the corporations after Dr. Constant.

PAHHS and BHHS each operated two different programs, a Primary Care program and a Medicare program. Ms. Dawson had complete authority over the payroll accounting for the programs, including the input of data into the computer systems for the payrolls and the review of the payrolls. Each of the four programs (viz., PAHHS Primary Care, PAHHS Medicare, BHHS Primary Care, and BHHS Medicare) had two checking accounts, a general account and a payroll account, for a total of eight checking accounts. While employed by PAHHS and BHHS, Ms. Dawson had signature authority for, and was authorized to issue checks from, all eight checking accounts and had complete responsibility and full authority for the issuance of all payroll checks by PAHHS and BHHS.

During the middle of 1987, petitioner worked for Dr. Constant as a computer consultant. At such time, petitioner was

the sole proprietor of a computer consulting business that included the delivery of computer equipment and the setting up of computerized bookkeeping and payroll systems.[4] Petitioner installed computer equipment for PAHHS and BHHS and set up their computerized bookkeeping and payroll systems. He also taught the employees of PAHHS and BHHS how to use the systems. Such computerized bookkeeping and payroll systems that were set up by petitioner included the four payroll checking accounts and the four general checking accounts maintained by PAHHS and BHHS that are referred to above. Petitioner also installed computers in the offices of other corporations operated by Dr. Constant. During 1988, petitioner also worked as a "handyman" for BHHS, setting up offices and moving boxes and furniture.

During 1988, Ms. Dawson caused checks to be issued to herself from the payroll checking accounts maintained by PAHHS and BHHS for her wages from the corporations in the amounts of $35,903.12 and $33,854.68, respectively. Also during that year, in addition to the checks for her wages, she used the computerized payroll system installed by petitioner to cause checks to be issued to herself from the payroll checking accounts in the amount of $153,726. Ms. Dawson signed each of the checks

---

[4] Petitioner operated such business from the middle of 1987 through the end of 1989.

on behalf of PAHHS or BHHS.  Ms. Dawson issued to herself between 13 and 22 payroll checks per month, with the amount of each check ranging from $50 to $1,500.  The checks were endorsed by Ms. Dawson and were deposited into joint checking accounts maintained by petitioner and Ms. Dawson during that year.

During 1989, Ms. Dawson caused checks to be issued to herself from the payroll checking accounts maintained by PAHHS and BHHS for her wages from the corporations in the amounts of $8,900 and $22,900, respectively.  Also during that year, in addition to the checks for her wages, she used the computerized payroll system installed by petitioner to cause checks to be issued to herself from such payroll checking accounts in the amount of $95,072.  Ms. Dawson signed each of these checks on behalf of PAHHS or BHHS.  The checks were endorsed by Ms. Dawson and were deposited into joint checking accounts maintained by petitioner and Ms. Dawson during that year.  Petitioner deposited certain of the checks Ms. Dawson received from PAHHS and BHHS into their joint checking account with First National Bank of Mid County.

Ms. Dawson did not hide from petitioner the funds she had embezzled.

On July 17, 1989, believing that Ms. Dawson had embezzled funds, Dr. Constant fired her.

Expenditures by Petitioner and Ms. Dawson

During September 1987, a new Lincoln Continental automobile was purchased for Ms. Dawson's use.  The purchase was financed with a loan of $29,976.  During November 1987, petitioner wrote two checks to Golden Triangle Remodeling totaling $9,700 for the cost of a three-car garage added to their home.  On December 29, 1987, petitioner purchased a new Ford Big Bronco automobile.  The purchase was financed with a loan of $22,079.28 to petitioner on which payments were made during 1988.

During 1988, petitioner and Ms. Dawson wrote checks totaling $146,752.26 on their joint checking account with Mid County Teachers.  Also during that year, petitioner and Ms. Dawson wrote checks or made transfers totaling $145,458.62 from their joint checking account with Texaco P.A.W.  Nearly all of the funds deposited into the joint checking account maintained by petitioner and Ms. Dawson with Texaco P.A.W. during 1988 were spent in that year.

Between January and April 1988, petitioner and Ms. Dawson paid $17,602 to Golden Triangle Remodeling for the addition of a computer room over their garage.  The room was furnished in 1988 with, inter alia, a desk, a computer cabinet, and custom-built bookcases.  During July and August of 1988, Don Lightfoot Home Builder, Inc., made improvements to the residence of petitioner

and Ms. Dawson that consisted of remodeling its living room and the bedrooms of their two daughters. The remodeling included installation of hardwood floors and new draperies in all three rooms, removal of part of a wall, and the addition of a skylight to one bedroom and of a bay window to the other. On November 3, 1988, Don Lightfoot Home Builder, Inc., was paid $3,227 for the improvements by a check drawn on the joint checking account with Texaco P.A.W. Petitioner also signed a check payable to Beaumont Cobbs Carpet, Inc., in the amount of $1,065 to pay expenses for remodeling one of his daughter's bedrooms. Petitioner was aware of the remodeling done at his home.

During 1988, Ms. Dawson purchased beds for their daughters at a cost of $5,000, a red cherry dining room set at a cost of between $5,000 and $6,000, a 25-inch color television and set of oak entertainment cabinets, a crystal chandelier, a living room set, a number of sewing machines, two portable televisions with built-in video cassette recorders, and a camcorder. Petitioner was aware of the items Ms. Dawson purchased for their home during 1988.

Also during 1988, a new Mercury Sable automobile was purchased that was financed with a loan to petitioner. Petitioner also purchased a 1987 Nissan pickup truck for $6,500 and paid for it with two checks he wrote on the joint checking

account with Texaco P.A.W.  Petitioner and Ms. Dawson also lent $4,400 to Ms. Dawson's sister and her husband for the purchase of a truck.

Also during 1988, petitioner purchased a 1967 28-foot wood-hulled Chris Craft boat (Chris Craft) for $7,500, paid for by withdrawals from the joint checking account with Texaco P.A.W. The Chris Craft was licensed and registered to petitioner.  The interior cabin of the Chris Craft was decorated by Fowler's Furniture & Design Gallery (Fowler's) in December 1988 at a total cost of $6,187.85.  Petitioner and Ms. Dawson met with an employee of Fowler's to discuss the decoration.  Petitioner incurred labor and parts expenses for work performed on the Chris Craft by Eastex Marine Maintenance on or about the following dates in the following amounts:

| | |
|---|---|
| Aug. 1, 1988 | $1,586.67 |
| Aug. 10, 1988 | 557.47 |
| Oct. 21, 1988 | 537.15 |
| Nov. 9, 1988 | 144.00 |
| Total | 2,825.29 |

Additionally, petitioner paid over $1,000 for further work on the Chris Craft.  Petitioner docked the Chris Craft at the Beaumont Yacht Club, and the membership in the club was in his name only. Petitioner paid an annual membership fee and monthly docking fees to the Beaumont Yacht Club for the Chris Craft that totaled approximately $1,250 per year.

During 1988, petitioner and Ms. Dawson went on a Caribbean cruise. During such year, Ms. Dawson's parents went on a Caribbean cruise that petitioner and Ms. Dawson gave them as a present for their anniversary. The cost of the trip was $1,316. Also during that year, petitioner, Ms. Dawson and their daughter Audrey went on a vacation to Disneyland in California. The $1,190 cost of the trip was paid with a check drawn on the joint checking account with Mid County Teachers. On Christmas Eve 1988, petitioner and Ms. Dawson gave Ms. Dawson's sister, her husband, her sister's two children, and petitioner's and Ms. Dawson's daughter Audrey a vacation to Disneyland. The $2,656 cost of the trip was paid with a check drawn on the joint checking account with Mid County Teachers.

During 1988, petitioner and Ms. Dawson were members of the Pompano Club, a private dining club.

On June 6, 1989, petitioner and Ms. Dawson purchased a 1988 Passport Motor Home (motor home) for $47,804 from Henry Courts RV.

Ms. Dawson did not hide from petitioner any of the items she purchased with embezzled funds.

Petitioner's and Ms. Dawson's Income Tax Returns

Petitioner and Ms. Dawson timely filed a joint Federal income tax return for each of their 1987 and 1988 taxable years

(hereinafter respectively referred to as the 1987 return and 1988 return). Their 1987 return reported wage income of $90,611, adjusted gross income of $92,522, and that petitioner's compensation from Gulf States Utilities was $41,782. Their 1988 return reported wage income of $85,862, adjusted gross income of $87,092, and that petitioner's compensation from Gulf States Utilities was $41,604. Forms W-2 for the 1988 taxable year show wages paid to Ms. Dawson by PAHHS and BHHS in the amounts of $27,854 and $29,902.12, respectively. Such Forms W-2 include $15,000 in wages from PAHHS and $15,000 in wages BHHS paid to Ms. Dawson that were omitted from petitioner's and Ms. Dawson's return for that year. Petitioner assisted Ms. Dawson in preparing the 1988 return. The purported signature of petitioner on the 1988 return is not in fact petitioner's signature.

Petitioner filed a separate Federal income tax return for the taxable year 1989 on May 21, 1990.

Certain Events Occurring Subsequent to the Years in Issue

Petitioner and Ms. Dawson separated on May 1, 1990, and were divorced on December 4, 1990.

On or about July 8, 1991, Ms. Dawson pled guilty in the U.S. District Court, Eastern District of Texas (District Court) to one count of embezzlement, in violation of 18 U.S.C. sec. 666, and one count of income tax evasion for the tax year 1988, in violation of section 7201.

Ms. Dawson was sentenced to 28 months' incarceration in Federal prison.  At the time of trial, Ms. Dawson was on supervised release from Federal prison.  She was ordered by the District Court to pay, and, at the time of trial, she was paying, (1) restitution to Dr. Constant and (2) taxes to the Internal Revenue Service (IRS) for 1988 in accordance with a payment schedule developed with the IRS.

OPINION

<u>Innocent Spouse Issue</u>

The first issue that we must consider is whether petitioner has shown that he is an innocent spouse with respect to the understatement of tax attributable to the funds embezzled by Ms. Dawson in 1988.

Spouses who file joint tax returns generally are jointly and severally liable for Federal income tax due on their combined incomes, as well as for interest on, and additions to, the tax. Sec. 6013(d)(3); <u>Park v. Commissioner</u>, 25 F.3d 1289, 1292 (5th Cir. 1994), affg. T.C. Memo. 1993-252.  The general rule is mitigated to some extent by section 6013(e), known as the "innocent spouse" rule.  <u>Park v. Commissioner</u>, <u>supra</u>.  Congress regards joint and several liability as an important adjunct to the privilege of filing joint tax returns, which generally results in a lower tax on the combined incomes of spouses than would be due were they to file separate returns, and any

relaxation of the rule of liability depends upon compliance with the conditions of section 6013(e).  Sonnenborn v. Commissioner, 57 T.C. 373, 380-381 (1971).  Because of its remedial purpose, however, the innocent spouse rule must not be given an unduly narrow or restrictive reading.  Sanders v. United States, 509 F.2d 162, 167 (5th Cir. 1975).  The question whether a taxpayer has established that he or she is entitled to relief as an innocent spouse is one of fact.  Park v. Commissioner, supra at 1291.

Section 6013(e)(1) provides in pertinent part that if:

> (A) a joint return has been made under this section for a taxable year,
>
> (B) on such return there is a substantial understatement of tax attributable to grossly erroneous items of one spouse,
>
> (C) the other spouse establishes that in signing the return he or she did not know, and had no reason to know, that there was such substantial understatement, and
>
> (D) taking into account all the facts and circumstances, it is inequitable to hold the other spouse liable for the deficiency in tax for such taxable year attributable to such substantial understatement,
>
> then the other spouse shall be relieved of liability for tax (including interest, penalties, and other amounts) for such taxable year to the extent such liability is attributable to such substantial understatement.

A taxpayer must prove that each requirement of section 6013(e) is met, and failure to prove any one of the requirements

prevents a taxpayer from qualifying for relief as an innocent spouse. Park v. Commissioner, supra at 1292; Purcell v. Commissioner, 826 F.2d 470, 473 (6th Cir. 1987), affg. 86 T.C. 228 (1986); Bokum v. Commissioner, 94 T.C. 126, 138 (1990), affd. 992 F.2d 1132 (11th Cir. 1993). In the instant case, the parties stipulated that petitioner filed a joint return with Ms. Dawson for 1988, notwithstanding that the signature on the return purporting to be petitioner's is not in fact his.[5] Respondent also concedes that there was a substantial understatement of tax attributable to grossly erroneous items of Ms. Dawson on the return. Respondent contends, however, that petitioner knew or had reason to know of the substantial understatement and that it is not inequitable to hold petitioner liable for the deficiency attributable to the substantial understatement.

The knowledge test, as stated above, requires a taxpayer to show that, at the time of signing a joint return, he or she did not know and had no reason to know of the substantial understatement of tax on the return. The relevant knowledge is of the transaction giving rise to the income omitted from the return, rather than of the tax consequences of such transaction.

---

[5] The failure of one spouse to sign a return does not prevent such return from being considered a joint return if the nonsigning spouse intended to file a joint return. See Shea v. Commissioner, 780 F.2d 561, 567 (6th Cir. 1986), affg. in part and revg. and remanding in part T.C. Memo. 1984-310; Estate of Campbell v. Commissioner, 56 T.C. 1, 12 (1971).

Park v. Commissioner, supra at 1293-1294; Sanders v. United States, supra at 169; Bokum v. Commissioner, supra at 146. Consequently, a spouse who knows or has reason to know of such a transaction does not qualify for relief as an innocent spouse. Park v. Commissioner, supra; Sanders v. United States, supra. A spouse has "reason to know" of an understatement if

> a reasonably prudent taxpayer under the circumstances of the alleged innocent spouse at the time of signing the return could be expected to know that the tax liability stated was erroneous or that further investigation was warranted. * * * [Park v. Commissioner, supra at 1293 (citing Sanders v. United States, supra at 166-167 and n.5.)]

In deciding the issue, factors we consider include: (1) The level of education of the spouse seeking relief; (2) the spouse's involvement in the family's business and financial affairs; (3) unusual or lavish expenditures made by the family; and (4) the "culpable" spouse's refusal to be forthright about the couple's income. Park v. Commissioner, 25 F.3d at 1293; Sanders v. United States, 509 F.2d at 167-170. In reaching our decision, we consider the interplay among the factors, and different factors will predominate in different cases. Bliss v. Commissioner, 59 F.3d 374, 378 (2d Cir. 1995), affg. T.C. Memo. 1993-390.

Turning to the facts of the instant case, we find that, even if, at the relevant time, petitioner did not actually know that Ms. Dawson was embezzling funds from her employers, i.e., the

source of the income,[6] he knew or had reason to know of the

receipt of the income attributable to the embezzlement. As to

the first factor, level of education, petitioner has presented no

evidence. We note, however, that, during the years in issue,

petitioner was employed by Gulf States Utilities as a power plant

operator and control operations foreman, employment from which he

earned over $40,000 in 1988, and that he had been so employed

since 1982. Beginning in mid-1987 and continuing through the

years in issue, petitioner also operated a computer consulting

business that included the delivery and installation of computer

equipment and the setting up of computerized bookkeeping and

payroll systems. Certainly he had some experience in business

and financial matters.

As to the second factor, involvement in the family's

finances, petitioner contends that Ms. Dawson or her mother

handled his family's financial affairs and that he was uninvolved

---

[6]
We cannot conclude with certainty from the record whether or not petitioner had actual knowledge that Ms. Dawson had embezzled funds from her employers when the 1988 return was signed. For instance, at trial, Ms. Dawson testified that, at the time the couple purchased a motor home in 1989, petitioner told her to get more money from the "agency", i.e., her employers, so that they could make a larger downpayment. The motor home was purchased on June 6, 1989, after the filing of the 1988 return in April 1989. Accordingly, such testimony, even if we were to believe it, would not necessarily establish that petitioner was aware in April 1989 that Ms. Dawson was embezzling funds from her employers. Although Ms. Dawson testified that petitioner had made similar statements at other times, she could not recall specific instances.

in such matters prior to March 1989, when he admits he assumed responsibility for writing checks to pay his family's bills. Perfect knowledge of one's family's financial affairs, however, is not required to satisfy the reason to know standard. Shea v. Commissioner, 780 F.2d 561, 567 (6th Cir. 1986), affg. in part and revg. and remanding in part T.C. Memo. 1984-310; Sanders v. Commissioner, supra at 168. We conclude that petitioner had sufficient involvement in his family's affairs to put a reasonable person in his position on notice that the income reported in the 1988 return was erroneous or that further inquiry was warranted. During 1988, Ms. Dawson caused PAHHS and BHHS to issue to her between 13 and 22 payroll checks per month, with the amounts of the checks ranging from $50 to $1,500. All of the funds embezzled by Ms. Dawson during 1988 were deposited in joint bank accounts over which petitioner had signature authority and on which he wrote checks. The statements for the accounts were mailed to the residence of petitioner and Ms. Dawson, and he opened and looked at least some of the statements. Petitioner knew where the statements were kept at their residence, and he could have reviewed them whenever he desired. Perusal of the bank statements would have alerted petitioner to the actual level of the couple's income. Furthermore, the number of deposits of payroll checks made by Ms. Dawson in the accounts and the dollar amount of the deposits reflected in the statements would have

shown petitioner that the amount of income Ms. Dawson was receiving from her employers was larger than the amount he claimed to have believed that it was during 1988. A taxpayer claiming innocent spouse relief cannot simply turn a blind eye to facts within his or her reach that would have put a reasonably prudent taxpayer on notice that further inquiry needed to be made. Sanders v. United States, supra at 169; Bokum v. Commissioner, 94 T.C. at 148; McCoy v. Commissioner, 57 T.C. 732, 734 (1972).

Moreover, in March 1989, petitioner opened a joint checking account at First National Bank of Mid County, into which he deposited certain of Ms. Dawson's payroll checks, checks that petitioner concedes represented some of the funds embezzled from PAHHS and BHHS. Petitioner reviewed and reconciled the statements for the account. As stated above, petitioner admitted that he assumed responsibility for writing checks to pay his family's bills at that time, prior to the time the 1988 return was filed in April 1989. Petitioner should have become aware no later than March or April 1989 of the true level of his family's income and expenditures. Moreover, petitioner assisted Ms. Dawson in preparing their 1988 joint income tax return.

In addition to his involvement in his family's financial affairs, we consider it significant that petitioner was involved in the business of Ms. Dawson's employers, PAHHS and BHHS.

During 1987, petitioner delivered, installed, and programmed computerized bookkeeping and payroll systems for PAHHS and BHHS in the offices of BHHS. Petitioner taught the employees of PAHHS and BHHS to use the systems. During 1988, Ms. Dawson used the systems to embezzle funds from her employers. Petitioner also installed computers in the offices of other corporations operated by Dr. Constant. Petitioner also worked as a "handyman" for BHHS, setting up offices and moving furniture and boxes.

The third factor we consider is the presence of unusual or lavish expenditures by petitioner's family. A taxpayer claiming relief as an innocent spouse cannot close his or her eyes to unusual or lavish expenditures that might have alerted him or her to unreported income. Terzian v. Commissioner, 72 T.C. 1164, 1170 (1979); Mysse v. Commissioner, 57 T.C. 680, 699 (1972). The presence of unusual or lavish expenditures may put a taxpayer on notice that it is probable that income is being omitted from a joint return. Estate of Jackson v. Commissioner, 72 T.C. 356, 361 (1979).

The overall amount of spending by petitioner and Ms. Dawson during 1988 should have put petitioner on notice that it was probable that income was omitted from their 1988 return. Petitioner and Ms. Dawson wrote checks on the joint checking account with Mid County during 1988 that totaled $146,752.26. During 1988, petitioner and Ms. Dawson wrote checks on the joint

checking account with Texaco P.A.W. in the amount of $145,458.62.
The total amount of the checks written on both the accounts thus
exceeded $290,000.  Such a level of expenditure was made possible
by the deposit in the accounts of the $153,726 that Ms. Dawson
embezzled from her employers during 1988.  Although the record
indicates that petitioner may have written only a relatively
small percentage of the checks drawn on the accounts, and
petitioner claimed to have been uninvolved in his family's
finances prior to March 1989, we do not think it reasonable to
conclude that he failed to notice that during 1988, he and Ms.
Dawson spent an amount that was two or three times (1) the amount
that he claimed to have believed to have been their income for
each of 1987 and 1988 (viz., between $90,000 to $120,000) and (2)
the amount of adjusted gross income reported on each of their
1987 and 1988[7] returns.

The specific expenditures disclosed by the record that were
made during 1988 also should have alerted petitioner to the
probable omission of income from the 1988 return.  While the
record shows that in 1987 a Lincoln Continental automobile and a
Ford Big Bronco automobile were purchased, and a three-car garage
costing $9,700 was added to petitioner's and Ms. Dawson's home,

---

[7]

    Petitioner has conceded that the 1988 return omitted the
following amounts received by Ms. Dawson:  (1) $30,000 of wage
income from PAHHS and BHHS; (2) gross receipts of $740, and (3) a
pension distribution of $1,055.

we find that expenditures made by petitioner's family in 1988 were lavish or unusual.

Significant sums were spent to remodel and furnish petitioner's home during 1988. Petitioner and Ms. Dawson paid $17,602 for the addition of a computer room over their garage. They also paid $3,227 for the remodeling of their living room and the bedrooms of their two daughters. Petitioner signed a further $1,065 check to pay expenses in connection with the remodeling.[8] Petitioner was aware of the remodeling. Petitioner was also aware in 1988 that Ms. Dawson purchased beds for their daughters at a cost of $5,000, a red cherry dining room set at a cost of between $5,000 and $6,000, a 25-inch color television and set of oak entertainment cabinets, a crystal chandelier, a living room set, a number of sewing machines, two portable televisions with built-in video cassette recorders, and a camcorder.

Expenditures for automobiles and a boat were also made during 1988. A Mercury Sable automobile was purchased, and petitioner purchased a 1987 Nissan pickup truck for $6,500, paying for it with two checks he wrote on the joint checking

---

[8]

Petitioner claims that the remodeling discussed above was financed by a loan. Although a loan of approximately $15,000 was funded in 1987, the total cost of the remodeling of petitioner's home in 1987 and 1988 after the funding of the loan exceeded the amount of the loan. Moreover, it seems reasonable to us that Ms. Dawson's embezzlement provided a source of funds from which payments on the loan could be made, aiding petitioner and Ms. Dawson in carrying the loan.

account with Texaco P.A.W. Also, petitioner and Ms. Dawson lent her sister and her husband $4,400 for the purchase of a truck. Petitioner also purchased a 28-foot Chris Craft boat for $7,500, paying for it with withdrawals from the joint checking account with Texaco P.A.W. Petitioner and Ms. Dawson paid $6,187.85 to decorate the boat, meeting with the decorator to discuss the decoration. Petitioner also incurred maintenance expenses of over $2,825.29 with respect to the boat in 1988. Petitioner paid yacht club membership and dockage fees of $1,250 with respect to the boat.

Significant travel financed by petitioner and Ms. Dawson also occurred during 1988. Petitioner and Ms. Dawson went on a Caribbean cruise. They gave Ms. Dawson's parents such a cruise costing $1,316 as an anniversary present. Petitioner, Ms. Dawson, and their daughter Audrey went on a vacation costing $1,190 to Disneyland in California. Petitioner and Ms. Dawson gave her sister, her husband, their two daughters, and petitioner's and Ms. Dawson's daughter Audrey a vacation costing $2,656 to Disneyland.

The fourth factor we consider is whether Ms. Dawson was forthright about the omitted income. Petitioner has not established that Ms. Dawson was evasive concerning her true level of income. We have found that Ms. Dawson did not attempt to hide the income from her embezzlement or her expenditures from

petitioner.  Indeed, all of the embezzled funds were deposited in and disbursed from joint checking accounts to which petitioner had access and with respect to which statements were available to him.

Under the circumstances of the instant case, a reasonably prudent person would have seriously questioned the gross income reported in the joint return petitioner and Ms. Dawson filed for 1988, and petitioner, therefore, had a duty of inquiry with respect to the correctness of the reported income, a duty that he failed to discharge.  Park v. Commissioner, 25 F.3d at 1293; Sanders v. United States, 509 F.2d at 167.  We accordingly find, based on the entire record, that petitioner knew or had reason to know of the substantial understatement of tax on the 1988 return resulting from the omission of the income embezzled by Ms. Dawson during such year.

The next matter we consider is whether it would be inequitable to hold petitioner liable for the deficiency attributable to the omission of the funds embezzled by Ms. Dawson from the 1988 return.  Sec. 6013(e)(1)(D).  In deciding the issue, we take into account all of the facts and circumstances. Id.; sec. 1.6013-5(b), Income Tax Regs.  A factor to be considered is whether the person seeking relief significantly benefited, directly or indirectly, from the omitted income.[9]

---

[9]

Although sec. 6013(e)(1)(D), since its amendment in 1984, no
(continued...)

Buchine v. Commissioner, 20 F.3d 173, 181 (5th Cir. 1994), affg.
T.C. Memo. 1992-36; sec. 1.6013-5(b), Income Tax Regs. Normal
support, which is to be measured by a couple's circumstances, is
not considered a significant benefit. Sanders v. United States,
supra at 168; Terzian v. Commissioner, 72 T.C. at 1172; Mysse v.
Commissioner, 57 T.C. at 699. A significant benefit exists if
expenditures have been made which are unusual for the taxpayer's
accustomed lifestyle. Terzian v. Commissioner, supra. Other
factors include: (1) Whether the spouse seeking relief has been
deserted by the other spouse or is divorced or separated from
that spouse, sec. 1.6013-5(b), Income Tax Regs.; and (2) probable
future hardships that would be visited upon the purportedly
innocent spouse were he or she not relieved from liability,
Sanders v. United States, supra at 171 n.16.

We conclude, based on the record in the instant case, that
petitioner received a significant benefit from the funds that Ms.
Dawson embezzled in 1988. The embezzled funds allowed more funds
to be available for petitioner's household than were provided by
the wage income that was earned by petitioner and Ms. Dawson and

---

[9](...continued)
longer expressly requires that a taxpayer seeking relief as an
innocent spouse show that he or she did not significantly benefit
from items of income omitted from a joint return, the question of
significant benefit is nonetheless a factor properly to be
considered in deciding whether it is inequitable to hold a spouse
liable for the understatement attributable to the omission.
Estate of Krock v. Commissioner, 93 T.C. 672, 678 (1989); Purcell
v. Commissioner, 86 T.C. 228, 241 (1986), affd. 826 F.2d 470 (6th
Cir. 1987).

reported on their 1988 return. Petitioner has not shown that Ms. Dawson used the funds exclusively for her own benefit, and it appears to us that the funds were largely expended for the benefit of petitioner's family or Ms. Dawson's relatives. The record shows that petitioner enjoyed significant benefits, such as expensive remodeling of and furnishings for his home, a boat which was purchased and redecorated at significant cost, and vacations to the Caribbean and Disneyland. Petitioner has not established that such expenditures were characteristic of his accustomed lifestyle, and we conclude that the benefits they afforded him were unusual for his lifestyle. With respect to the other factors to be considered, we note that, while petitioner was not deserted by Ms. Dawson, they separated and were divorced in 1990. Such circumstance, however, does not outweigh the significant benefit that petitioner received from Ms. Dawson's embezzlement. Petitioner also has not established that any hardships would be visited upon him were he not to be relieved from liability for the deficiency attributable to the omission of the embezzled funds from the 1988 return.

We find, therefore, that it would not be inequitable to hold petitioner liable for the understatement attributable to the funds embezzled by Ms. Dawson in 1988.

Based upon the foregoing, we hold that petitioner is jointly and severally liable for the deficiencies in, and additions to,

tax attributable to the funds Ms. Dawson embezzled from her employers during that year.

Community Income Issue

The next issue we shall consider is whether any of the funds embezzled by Ms. Dawson during 1989 are taxable to petitioner.[10] Petitioner is taxable on the funds to the extent of his ownership interest under Texas law.  United States v. Mitchell, 403 U.S. 190, 194-197 (1971), and cases cited therein.  Texas law provides for a community system of property rights of spouses.  Tex. Const. art. 16, sec. 15; Tex. Fam. Code Ann. sec. 5.01 (West 1993).  Under that system, each spouse has a vested interest in, and is the owner of, one-half of all such property.  Johnson v. Commissioner, 72 T.C. 340, 343 (1979).  Consequently, a spouse is liable for the Federal income tax on the portion of any income that is community property.  Id.  A spouse, however, has no ownership interest in, and is not taxable on, income that is the separate property of the other spouse.  Id.  Our inquiry accordingly focuses on whether the $95,072 embezzled by Ms.

---

[10]

Because petitioner filed a separate tax return from Ms. Dawson for 1989, petitioner concedes that he is not eligible for relief as an innocent spouse under sec. 6013(e).  Petitioner, however, does not contend, and we do not consider whether, he qualifies as an innocent spouse pursuant to sec. 66(c), under which a taxpayer who does not file a joint return may be relieved of liability for tax on items of community income attributable to the taxpayer's spouse.  See Roberts v. Commissioner, 860 F.2d 1235, 1238-1239 (5th Cir. 1988), affg. T.C. Memo. 1987-391.

Dawson during 1989 was community property or her separate property.

The pertinent Texas statute defines community property as "the property, other than separate property, acquired by either spouse during marriage." Tex. Fam. Code Ann. sec. 5.01(b) (West 1993). We have previously held that the well-established rule in Texas is that the term "acquired" as it is used in the statute refers to the origin or inception of title. Johnson v. Commissioner, supra at 344. In Johnson v. Commissioner, supra at 344, we reasoned as follows:

> Consequently, a spouse who acquires property during marriage must acquire some legal title to the property before such property will be characterized as community property. Hence, if a spouse acquires possession of property without title, the property remains the separate property of such spouse.
>
> * * * * * * *
>
> Under Texas law, where property is acquired illegally, whether title to such property passes to the illegal taker depends on whether the owner intended to pass both possession and title to the illegal taker. [Citations omitted.]

We must accordingly consider whether petitioner has carried his burden of proving that PAHHS and BHHS did not intend to pass to Ms. Dawson both possession of and title to the funds she embezzled in 1989. Ms. Dawson was authorized to issue the payroll checks in her name that represented the embezzled funds. She was responsible for and had signature authority over all of the payroll checking accounts maintained by PAHHS and BHHS and

issued all of the payroll checks for those entities.  Ms. Dawson, therefore, possessed the authority to act on behalf of those entities to pass both possession of and title to the funds in those payroll accounts to others.  Based upon our consideration of the entire record in the instant case, we conclude that petitioner has not carried his burden of proving that, in issuing the checks, PAHHS and BHHS did not intend to pass to Ms. Dawson both possession of and title to the funds embezzled by her during 1989.  Rule 142(a).

We, therefore, hold that the $95,072 embezzled by Ms. Dawson during 1989 is community income, one-half of which is taxable to petitioner.

To reflect concessions and the foregoing,

Decisions will be entered

under Rule 155.